**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.   1:21-mj-02017-Becerra


UNITED STATES OF AMERICA

vs.

ANTHONY BERNARD CARTER,

      **Defendant.**
_____/

**<u>CRIMINAL COVER SHEET</u>**

1.  Did this matter originate from a matter pending in the Central Region of the United States
    Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?      __ Yes   X  No

2.  Did this matter originate from a matter pending in the Northern Region of the United States
    Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?      __ Yes   X   No

3.  Did this matter originate from a matter pending in the Central Region of the United States
    Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?      __ Yes   X  No


        Respectfully submitted,

        ARIANA FAJARDO ORSHAN
        UNITED STATES ATTORNEY

BY:   _____
        Alejandra L. López
        Assistant United States Attorney
        Southern District of Florida
        Florida Bar No. 37132
        99 Northeast 4th Street, 5th Floor
        Miami, Florida 33132-2111
        Telephone: (305) 961-9241
        E-mail: Alejandra.Lopez@usdoj.gov

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   1:21-mj-02017-Becerra |
| ANTHONY CARTER, | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____01/20/2020-01/26/2020_____ in the county of _____Miami-Dade_____ in the
_____Southern_____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1591(a)(1) and (b)(1) | Sex Trafficking of a Person by Force and Coercion |
| 18 U.S.C. § 2421(a) | Transportation of a Person for Sexual Activity |
| 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c) | Sex Trafficking of a Minor by Force and Coercion |
| 18 U.S.C. § 2423(a) | Transportation of a Minor for Sexual Activity |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Alex G. Loff, Special Agent, FBI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by  Telephone.

Date:   ____January 7, 2020____

_____
*Judge's signature*

City and state:   _____Miami, Florida_____

Hon. Jacqueline Becerra, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

Your Affiant, Alex Loff, a Special Agent with the Federal Bureau of Investigation (hereinafter, "FBI"), who, being duly sworn, deposes and states as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the FBI and have been so employed since March 2018. I currently serve as part of the Crimes Against Children group and the FBI Child Exploitation and Human Trafficking Task Force in the FBI's Miami Field Office. I am an officer of the United States, within the meaning of 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations of, and make arrests for, violations of federal law, including the offenses enumerated in Title 18, United States Code, Sections 1591, 2422, 2423, 2251, and 2252, amongst others. My duties include the investigation of crimes involving the sexual exploitation of minors, including the sex trafficking and commercial trafficking of minors and the possession and production of child pornography.  I have received training on the proper investigative techniques for these violations, including the use of surveillance techniques, undercover activities, and the application and execution of arrest and search warrants. I have conducted and assisted in several child exploitation investigations, including undercover operations to recover juvenile victims of sex trafficking, and have executed search warrants that have led to seizures of child pornography.

2.      The facts contained in this Affidavit are based upon my own personal knowledge, as well as information provided by other individuals, including other law enforcement officials, and my review of records obtained during the course of this investigation.  I have not included in this Affidavit each and every fact and circumstance known to me, but only the facts and circumstances sufficient to establish probable cause.

## PURPOSE OF THE AFFIDAVIT

3.      This Affidavit is submitted in support of a criminal complaint charging that, from on or about January 20, 2020, continuing through on or about January 26, 2020, ANTHONY BERNARD CARTER (hereinafter, "CARTER") did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain, and maintain, and solicit by any means, a person, that is, the Adult Victim, knowing, and in reckless disregard of the fact, that means of force, threats of force, and coercion, and any combination of such means would be used to cause the Adult Victim to engage in a commercial sex act, in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1); and did knowingly transport an individual, that is, the Adult Victim, in interstate and foreign commerce, with intent that such individual engage in prostitution, in violation of Title 18, United States Code, Section 2421(a).

4.      This Affidavit is also submitted in support of a criminal complaint charging that, from on or about January 20, 2020, continuing through on or about January 22, 2020, CARTER did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain, maintain, and solicit by any means, a minor, that is, the Minor Victim, knowing, and in reckless disregard of the fact, and having had a reasonable opportunity to observe the Minor Victim, that the Minor Victim had not attained the age of 18 years and would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(2) and (c); and did knowingly transport an individual, that is, the Minor Victim, who had not attained the age of 18 years in interstate and foreign commerce, with intent that the individual engage in any sexual activity for which any person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2423(a).

**PROBABLE CAUSE**

5.      On or about January 22, 2020, law enforcement conducted a proactive undercover operation designed to identify and assist juvenile and adult victims of human trafficking. Consequently, law enforcement targeted online escort postings offering "out-calls" in the Miami and Miami Beach area. In my training and experience, I know the term "out-call" refers to when a person travels to a location to meet a client for the purpose of engaging in commercial sex acts.

6.      During this operation, law enforcement identified an online escort advertisement on listcrawler.com and megapersonals.com, entitled "Sweet Double Trouble," that contained several photographs of various females.  One of the photographs depicted a partially nude, white young female in lingerie bent over on a bed. Another featured a young female whose vaginal area was being touched by another female. The only text in the posting read, "I am a one in a million experience. 22 years old, White, 5'2, Hazel Eyes, Red hair" and listed a contact phone number with out-of-state area code 213 (hereinafter, the "213 Phone Number).  Law enforcement conducted a search of the online posting, which revealed that the advertisement was previously posted in numerous other cities outside of Florida and was advertised with a different phone number.

7.      Based on the advertisement, on or about January 22, 2020, a Miami Beach Police Department (hereinafter, "MBPD") detective working in an undercover capacity (hereinafter, the "UC") proceeded to send text messages to the 213 Phone Number to negotiate a one hour "out-call" date for $250.00. During the text message exchange with the 213 Phone Number, the UC was asked to "send me a pic of the donation with just 3 fingers to verify your [sic] real and ready." The UC knew from prior training and experience that this is a method of "screening" customers to assure that they are not law enforcement. The UC sent the requested picture. Afterward the UC

and the 213 Phone Number made arrangements to meet at the Loews Hotel located at 1601 Collins Avenue in Miami Beach, Florida (hereinafter, the "Lowes Hotel") in room 405 later that night at around 9:00 p.m.

8.      Afterwards, the UC received a text message from the 213 Phone Number saying, "about to call from my other number." At approximately 8:35 p.m. the UC received a phone call from phone number with out-of-state area code 678 (hereinafter, the "678 Phone Number") and spoke to a female that advised him she was "pumping gas at the gas station on 23rd Street" and that she was going to be at the hotel soon. During this brief 30-second conversation, the UC heard a male voice in the background telling the female on the phone to "make sure he's not a cop."

9.      At approximately 8:53 p.m., the UC received another phone call from the 678 Phone Number from the same female. The female stated that she had arrived at the Loews Hotel and was walking into the lobby. The female was then directed by the UC to room 405.

10.      At approximately 8:56 p.m., the female knocked on the door. Upon opening the door, the UC recognized the female as being the young female pictured in the online escort posting previously mentioned in Paragraph 6. The young female (hereinafter, the "Minor Victim") introduced herself and, upon entering the room, held a black flip phone up to her face. The young female then requested $250.00 and asked the UC to "go put on a condom." The UC then handed the young female $250.00 in official allocated funds and observed as the Minor Victim immediately sent a text message on the black flip phone.

11.      The UC then gave a visual take down signal and the Minor Victim was detained. The Minor Victim was subsequently identified as a 17-year-old from Georgia. Law enforcement explained to the Minor Victim that they were human trafficking detectives and were worried about her welfare. The Minor Victim then immediately began to cry and stated, "I didn't even want to be

here! I was forced to come on this date!" I know from my training and experience that the term "date" is used to refer to a meeting with a person for the purpose of engaging in commercial sex acts.

12.     The Minor Victim was then asked who forced her to come and she stated, "Just look at my phone, I don't want to get anyone in trouble, but you can see for yourself." Law enforcement then opened the black flip phone that was in the Minor Victim's possession (hereinafter, the "Minor Victim's Cell Phone"), which revealed a message on the screen from the Minor Victim to "Nikki" at phone number with out-of-state area code 832, (hereinafter, the "832 Phone Number"), at 8:57 p.m. that said, "G." In response, the 832 Phone Number sent a text message that came in at 8:59 p.m. that said, "Get extras for your daddy." I know from my training and experience that the term "daddy" is used to refer to someone who controls or directs a person engaging in commercial sex acts, commonly known as a "pimp."

13.     The Minor Victim further stated, "I am going to be in big trouble if I am not outside in one hour when this date is supposed to be over." Law enforcement then responded to the security office of the hotel.  The hotel surveillance cameras revealed a black, four-door sedan drove into the property and dropped off the Minor Victim a few minutes before her encounter with the UC. The vehicle is then seen leaving the property in an unknown direction of travel.

14.     Approximately one hour after the Minor Victim arrived at the hotel, the UC sent a text message to the 832 Phone Number from the Minor Victim's cell phone saying, "Done." At approximately 9:46 p.m., the 832 Phone Number replied, "Coming," and at approximately 9:47 p.m. also texted, "4 min." At approximately 9:51 p.m., law enforcement observed a black, four-door Toyota Corolla bearing Texas license plate KMT3428 (hereinafter, the "Toyota Corolla"), enter the hotel ramp and idle at the same location that the Minor Victim had been dropped off.

15.     Law enforcement then noticed that the Minor Victim's cell phone was receiving a phone call from the 832 Phone Number. An MBPD detective then walked towards the Toyota Corolla with the Minor Victim's cell phone in hand.  The detective observed a young male, wearing a black hooded sweater, in the Toyota Corolla holding a gold iPhone cell phone in front of his face. The detective then answered the call from the 832 Phone Number on the Minor Victim's cell phone. When the Minor Victim's phone connected to the call, the detective observed and heard the male in the Toyota Corolla start shouting, "Yo! Where you at! I am here!" while simultaneously hearing the same statements come through the Minor Victim's cell phone.

16.     A visual take down signal was given and law enforcement approached the Toyota Corolla. An office in full police uniform approached the driver side of the Toyota Corolla and attempted to contact the male by knocking on the window. The driver refused to open the window; placed the vehicle in gear; fled west towards Collins Avenue; and made a fast right turn onto northbound Collins Avenue. Law enforcement within a marked MBPD vehicle observed the reckless northbound turn and activated emergency lights and sirens in order to conduct a traffic stop of the Toyota Corolla.  The Toyota Corolla did not stop, but rather drove against oncoming southbound Collins Avenue traffic and made a right turn on 17th Street, heading east. While the Toyota Corolla was still in motion, the male got out of the vehicle and ran in an unknown direction of travel. The Toyota Corolla then crashed into a barrier at the end of the 17th Street. A K-9 search was conducted of the area for the male, but it yielded negative results.

17.     Law enforcement responded to the scene of the vehicle and observed a gold-colored Apple iPhone (hereinafter, the "Gold iPhone"), on the driver's side floorboard in plain view through the driver side window. The Gold iPhone resembled the same phone that law enforcement had observed the male driver using to communicate with the Minor Victim's cell phone. Law

enforcement seized the Gold iPhone. The Toyota Corolla was then sealed by a crime scene technician and towed to MBPD.

18.     Crime scene technicians then took the Gold iPhone to photograph it; secure it; and properly impound it at a secure MBPD room for further review, as further described in Paragraph 25. While photographing the Gold iPhone, crime scene technicians found two Texas state identifications cards inside the Gold iPhone's plastic cover.  One of the identification cards belonged to a female with the initials "P.D.G." (hereinafter, "Associate 1"). The other identification card belonged to a female, subsequently identified as the Adult Victim. A records check of the Toyota Corolla revealed that the Adult Victim is the registered owner of the Toyota Corolla.

19.     On or about January 23, 2020, law enforcement obtained a state search warrant, signed by Miami-Dade Circuit Court Judge Dava J. Tunis, for the Toyota Corolla.  On or about January 27, 2020, the search warrant was executed. Amongst other items of evidentiary value inside the Toyota Corolla, law enforcement found several receipts from hotels and fast food restaurants in other states, including Georgia. Law enforcement reviewed all of the receipts that were recovered in the vehicle and found that the only one from Florida was for a Burger King located at 1700 Biscayne Boulevard, Miami, Florida, 33132, which reflected an order, number 63, and had the date and time of on or about January 22, 2020 at 4:12 p.m. (hereinafter, the "Burger King").

20.     Crime scene technicians also recovered a Georgia identification card for CARTER, (hereinafter, "CARTER'S ID Card"), bearing date of birth xx/xx/1992 and Georgia identification number xxxxx9201, which was found underneath the driver seat, close to the center console.

Crime scene technicians also collected DNA swabs and latent fingerprints of value, which were sent for further analysis.

21.     Law enforcement observed that the person depicted in the photograph on CARTER'S identification card was consistent with the description provided by the MBPD detective who had seen the male driving the Toyota Corolla at the hotel. Law enforcement obtained a photograph of CARTER from the Georgia Department of Driver Services, and presented it to the MBPD detective. Upon being presented with the photograph, the detective immediately identified CARTER as the person that fled in the black Toyota Corolla on or about January 22, 2020 from the ramp of the Loews Hotel.

## <ins>INTERVIEW OF THE MINOR VICTIM</ins>

22.     On or about January 28, 2020, law enforcement met with the Minor Victim and explained they wanted to speak to her regarding the incident from on or about January 22, 2020. An MBPD detective then presented the Minor Victim with a 6-photograph sequential lineup that included a photograph of CARTER. Upon reviewing the lineup, the Minor Victim stated that the male that dropped her off for the date was not in the lineup. Another MBPD detective asked the Minor Victim if she would be willing to look through the photographs again. The Minor Victim then stated, "I am scared to tell you guys the truth. Where I am from when someone talks to the police they end up dead." The detective then asked her if the person that drove her to the date was in one of the photographs and she replied, "Yes, but I can't tell you which one. He knows everyone and he will find out."

23.     The Detective then asked the Minor Victim if she knew the Adult Victim and Associate 1. The Minor Victim stated that he she didn't want to get them in trouble. However, when asked if they needed help, the Minor Victim replied, "No [Adult Victim] and I were working

together before we were brought down here by him." When she said "him," the Minor Victim pointed at the folder that contained the photographic lineup. The detective again asked her if she was willing to identify the person in the lineup, but the Minor Victim stated, "I can't tell on them."

24.     The detective then offered to check on any personal property the Minor Victim may have been left behind, and she stated, "We had an Airbnb at 1750 North Bayshore Drive PH#1 5214." The Minor Victim explained the Airbnb was only rented for two nights and that she would like to retrieve a Louis Vuitton wallet containing a fake identification card with a name with "A.F." The Minor Victim further stated that she had not spoken to anyone since she had been taken into custody.

## FURTHER INVESTIGATION

25.     On or about January 30, 2020, law enforcement received three Latent Fingerprint Evaluation/Comparison Reports. The reports detailed the following:

a.      Three of the latent fingerprints found on items in the interior of the Toyota Corolla (two from a Gatorade Bottle and one from a "Fila" shoe box) were a match to CARTER. Four other latent fingerprints from different areas of the Toyota Corolla were matched to the Minor Victim.

b.      Latent fingerprints recovered from the Burger King receipt, a CVS receipt, and a McDonalds receipt found inside the Toyota Corolla were a match to CARTER.

c.      A latent fingerprint recovered from an "Extended Stay America" hotel booklet was matched to Associate 1.

26.     On or about February 4, 2020, law enforcement responded to the Burger King from where the Burger King receipt previously mentioned in Paragraphs 19 and 25(b) originated.  Law enforcement were able to obtain video surveillance from the Burger King, which revealed a drive-

thru order from on or about January 22, 2020 where the Toyota Corolla receives the order. The driver of the Toyota Corolla appears to be a male matching CARTER's description.

27.     On or about February 4, 2020, law enforcement also responded to the Loews Hotel and obtained security footage showing the Minor Victim exiting a black four door sedan and entering the hotel to meet the UC. Law enforcement also obtained video footage of the Toyota Corolla fleeing from law enforcement from the hotel.

28.     On or about February 4, 2020, law enforcement obtained video surveillance from City of Miami Beach cameras from on or about January 22, 2020, that showed the Toyota Corolla fleeing from a MBPD patrol vehicle with its lights and sirens activated. The video footage also showed that, during this flight, the Toyota Corolla almost struck pedestrians in the crosswalk at Lincoln Road and Collins Avenue.

29.     On or about February 7, 2020, law enforcement called the Minor Victim's mother and asked her if she knew who her daughter had traveled with to Miami. The mother stated that she did not know that the Minor Victim had left Georgia or any of her current friends. The mother further stated that the only person the Minor Victim mentioned was a male by the name of "Prince," but that she had never seen "Prince." The mother then provided an Instagram account, "a**********e," which the Minor Victim used to let the mother and her older sister know that she is "alive." The Minor Victim's sister also provided the Instagram account of "ghettosprince" to law enforcement, and stated that she believed the male in "ghettoprince" was the person that got the Minor Victim to tattoo "Princess" on her forearm. An MBPD Detective preserved both Instagram accounts via the Facebook Law Enforcement Portal (Facebook confirmation # 4497086).

30.     Law enforcement reviewed the public profile for the Instagram account used by the Minor Victim, "a***********e." The main account picture is of the Minor Victim's face and her forearm displaying the "Princess" tattoo. Underneath the main account picture, in bold letters, is the word "PRINCE$$." Furthermore, the last post on the account was a video of the Minor Victim.

31.     Law enforcement also reviewed the public profile for Instagram account "ghettosprince." The main account picture is of CARTER. The account contains numerous other photographs and videos of CARTER and also contains a YouTube link for CARTER. For example, the last post on "ghettoprince," posted on or about January 20, 2020, depicted a female taking a video of her backside on front of a mirror while wearing a thong.  The caption underneath the video stated, "What would you do?"

## CARTER'S APPLE IPHONE AND APPREHENSION

32.     On or about January 23, 2020, law enforcement obtained a state search warrant, signed by Miami-Dade Circuit Court Judge Dava J. Tunis, for the Gold iPhone. A forensic review of the Gold iPhone revealed the Gold iPhone was used to access and use Instagram account "ghettosprince." Furthermore, the review also revealed that "ghettoprince" was in communication with other Instagram users. Among the messages retrieved from "ghettoprince's" Instagram application on the Gold iPhone, on or about January 23, 2020 at approximately 2:21 a.m., "ghettospince" sent a message to another Instagram user stating, "Oh. My new hoes is killing shit no .. cap so if u tryna back down u can't be with that embarrassing ass mindset get here and follow my instructions and boss up .. I got a plug on getting asses and titties did."

33.     A state arrest warrant for CARTER was issued on or about February 21, 2020 by Miami-Dade Circuit Court Judge Jeri B. Cohen for various state criminal charges stemming from the events from on or about January 22, 2020.

34.    On or about March 2, 2020, law enforcement obtained a federal pen register for the Instagram account "ghettospince" in order to locate CARTER (*see* case no. 20-mj-02333-Goodman). The returns from the pen register revealed that the IP addresses used to log in to "ghettoprince" on or about March 7, 2020 were all located in Atlanta, Georgia. Subpoenas were sent for IP addresses which revealed they were registered to a person with the initials "I.E." at the residence located at 2200 Parklake Drive, NE, Apartment 1104, Atlanta, Georgia 30345 (hereinafter, the "Atlanta Address").

35.    On or about August 11, 2020, law enforcement located and arrested CARTER at the residence located at the Atlanta Address, which law enforcement determined belonged to his girlfriend. At the time of the arrest, CARTER had a cellphone.

## INTERVIEW OF VICTIM 2

36.    On or about December 21, 2020, law enforcement located and interviewed the Adult Victim. During that interview, the Adult Victim stated she met CARTER in Atlanta, Georgia when she visited that city with three friends. While in Atlanta, the Adult Victim stated that her friends were staying in hotels where they were engaging in commercial sex acts. During their visit, two of the Adult Victim's friends received phone calls from a male to discuss their "futures," but the friends hung up on the caller. Eventually, the same male called the Adult Victim and told she was too pretty to be engaging in commercial sex acts and that she could be in music videos. The Adult Victim decided to go on an "out-call" where she was seen by CARTER at a house full of other men. CARTER told the Adult Victim that he was a manager and told her she should be doing something different. The Adult Victim, afraid for her safety and that CARTER would not let her leave, gave him all the money she had on her at the time, approximately $800, hoping he would

let her leave if she gave it to him. When she gave CARTER the money, CARTER told the Adult Victim it was now time to call him "pimp" and she was CARTER's property.

37.     The Adult Victim later returned to her hotel, but CARTER kept calling her from different numbers telling her that if she didn't come back to him, his people would come and rob her. The Adult Victim continued to go to other "out-calls" and did not contact CARTER. However, CARTER kept calling the Adult Victim from different numbers and finding her and making contact in person.  The Adult Victim stated she was afraid because she felt she couldn't get away from him. At some point, CARTER contacted the Adult Victim and told her he was not a "gorilla pimp" but "you paid me and you're my property." CARTER then told her that if she didn't go get her car and come back to him in an hour, it would be a problem.

38.     As a result, the Adult Victim retrieved her belongings and met with CARTER.  That same day, the Adult Victim stated CARTER eventually took her to a gas station where he got her wine and food, and then brought her to a hotel where he forced her to have sex with him. CARTER then got the Adult Victim a job at a strip club where he knew people.

39.     The Adult Victim further stated that, approximately three days later, CARTER showed up with a girl that the Adult Victim identified as the Minor Victim, who she described as "childish." CARTER brought them to a Red Roof Inn located at 2200 Corporate Plaza Parkway SE, Smyrna, Georgia 30080 (hereinafter, the Red Roof Inn") to engage in commercial sex acts. The Adult Victim believes they spent approximately one week at the Red Roof Inn, but in different rooms. The Adult Victim stated that CARTER gave her money to rent at least one of the rooms but never asked the Minor Victim to rent a room. The Adult Victim was shown a video from the "ghettoprince" Instagram account, and she stated it was a video depicting her and the Minor Victim at the Red Roof Inn.

40.     The Adult Victim also stated that the room she occupied with the Minor Victim at the Red Roof Inn had two beds: one on which to sleep and the other on which to engage in commercial sex acts. While they were at the Red Roof Inn, CARTER told the Minor Victim to show the Adult Victim "the ropes," which the Adult Victim understood to mean how to have sex for money. CARTER told the Adult Victim that he had worked with the Minor Victim before, which she understood to mean the Minor Victim had given CARTER money from engaging in commercial sex acts. Additionally, the Minor Victim told the Adult Victim that she had been "doing it" with CARTER for a long time.

41.     In total, while in Atlanta, the Adult Victim stated she engaged in approximately 30 commercial sex acts under the direction of CARTER. They were "in-calls," meaning people came to the location in order to engage in commercial sex acts with the victims. The Adult Victim stated that while one victim would be engaging in a commercial sex act, the other victim would be in the bathroom and CARTER would sit in the Toyota Corolla in the parking lot, which is why the Adult Victim knew it wasn't safe to ever try and leave. On at least one occasion, CARTER made the Adult Victim and Minor Victim go to a bar to get clients. The Adult Victim stated that CARTER always took the money she made from commercial sex acts.

42.     At some point, CARTER told the Adult Victim and the Minor Victim that they were going to Miami for the Superbowl because it was slow in Atlanta and "all the ballers" would be in Miami. CARTER further told the Adult Victim that she would work at the strip club "Booby's on the River." When the Minor Victim said she wanted to work there, CARTER said she could not. CARTER and the Adult Victim and the Minor Victim then got into the Toyota Corolla and left Atlanta. The Adult Victim stated she eventually fell asleep, and when she woke up, they were in Miami.

43.     The Adult Victim stated that they stayed at an Airbnb in a high rise building near the water. Law enforcement showed her a video from a video recovered from the "ghettoprince" Instagram account, which depicted both victims in a high-rise apartment.  The Adult Victim identified herself and the Minor Victim in the video and stated the video depicted the high-rise Airbnb they rented in Miami.

44.     As he had indicated before they left Atlanta, the Adult Victim stated CARTER ordered her to put on something nice so she could get a job at the strip club. She indicated she went in to the strip club without CARTER (as going with him would signal that he was her pimp), but was unable to get a job because she did not have a license to strip.

45.     The Adult Victim stated that CARTER was in charge of the online prostitution advertisements (hereinafter, the "Ads") and had Ads on both "adult search" and "listcrawler." The Adult Victim stated that CARTER controlled the Ads because he knew that if she was in charge of posting her own ads she would not make money, as she did not want to engage in any commercial sex acts. Additionally, CARTER wanted to take new pictures of her for the Ads, but she refused. Eventually, the Adult Victim noted that he changed their location on the Ads to Miami and ordered the women not to charge less than $300 for sex, unless it was really slow. Law enforcement then showed the Adult Victim the Megapersonals Ad previously discussed in Paragraph 6, and she identified herself and the Minor Victim as the women depicted in that Ad. She further stated that CARTER used the title "Sweet Double Trouble" on Ads to advertise her and the Minor Victim.

46.     The Adult Victim further advised that, once a "trick" would text her cell phone, CARTER would often be the person to text with the "tricks" on her phone. I know from my training and experience that the term "trick" is used for a person who pays money in exchange for

commercial sex acts.  The Adult Victim further advised that, at times, CARTER would let the Adult Victim and the Minor Victim text with the "tricks," although he would check the conversation afterwards. Additionally, CARTER would constantly check to see if the victims were following up on phone calls by checking their phones every 20 to 30 minutes. She also advised that, since CARTER did not have a phone while they were working together, he would often use her phone to log into his Instagram account and would also log into her account.

47.     The Adult Victim further stated that CARTER would direct her on how to act with the clients, both by text and in person. Amongst CARTER's instructions were that (1) she was to ask for a thumbs up picture and a picture with four fingers on the money while texting and (2) she was to always get the money in her hands first before engaging in commercial sex acts with the clients and must ask if the clients were police.

48.     The Adult Victim advised that while in Miami she only engaged in two commercial sex acts, both with the same client. The Adult Victim stated that both she and the Minor Victim got an Uber (using the Adult Victim's account) from the Airbnb to a rundown hotel somewhere in Miami. She further advised that the Minor Victim had sex with the client first, went first but told the Adult Victim the client was rough. Ultimately, Adult Victim "finished him off," and they eventually got an Uber back to the Airbnb. According to the Adult Victim, the client gave them approximately $1,500 to $1,700 and a lot of drugs as payment. When they returned to the Airbnb, they gave CARTER all the money and drugs. CARTER then became excited and began calling all of his friends saying that he got money.

49.     The next day, the same client contacted the Adult Victim because he wanted to see the Adult Victim, but not the Minor Victim. As a result, the Adult Victim advised she met up with the client again and engaged in commercial sex acts with him, for which he paid her $700, so she

went back and made approximately $700.  When she returned to the Airbnb, CARTER took her phone, her car, and the Minor Victim to go to an "out-call," and afterward she fell asleep.  She advised she was awoken by someone banging on the door. The Adult Victim advised that when she answered the door, it was CARTER telling her to, "get your shit." She obeyed him and collected her things after which they got in an Uber and went hotel hopping until they ended up in a hotel with a heart shaped bathtub.

50.     The Adult Victim advised she asked CARTER several times where the Toyota Corolla was, but CARTER would not give her an answer. She also advised she asked CARTER continuously for the Minor Victim, to which CARTER told her to mind her business. A few days after leaving the Airbnb, CARTER eventually told her that the Minor Victim was caught by the police, but he was not worried because the Minor Victim would not tell on him. CARTER also told the Adult Victim that if she ever got caught by police, she should say that her car got stolen.

51.     During this time, the Adult Victim advised that CARTER was calling a lot of people looking for a way out of Miami.  Eventually, she and CARTER received Greyhound bus tickets to Atlanta from a person she believed was CARTER's mother. When they arrived in Atlanta, they stayed at a female's apartment. Eventually, CARTER rented a room at a Motel 6 for the Adult Victim.  During her stay there, CARTER would leave her alone for small amounts of time, but always eventually check in with her in person.

52.     After Miami, the Adult Victim advised she was with CARTER in Atlanta for approximately one month. During this time, CARTER would be on the "sex websites" all day looking for new girls. He eventually succeeded in "trapping" new girls by acting as a client, just as he had done with her.  During this time, the Adult Victim's family kept calling her, but when she was on the phone with them, CARTER would stand over her and tell her to say she was fine.

53.     At some point, the Adult Victim stated that, in order to try and get back home, she lied to CARTER and told him she called her mom and sent a picture of him so that if anything happened to her, the mother would know who he was. She also lied to him and told him that if she were allowed to go home, she would work for him there. CARTER finally allowed the Adult Victim to leave and told her to go immediately.  The Adult Victim does not think CARTER would have let her leave if not for the two lies she told him, as she told him many times before that she wanted to go home, and he wouldn't let her.

54.     The Adult Victim stated she eventually returned home. After her return, she stated CARTER called her and asked her to send him girls. CARTER eventually became upset she had left. He also told her that if the Adult Victim had sex with anyone, he would kill her. CARTER also tried to get her to come back to him by sending her messages about how much money he had and by telling her he bought her a dog. He also said he would pay her back for the car she lost in Miami, at one point sending approximately $214 to her from another female's CashApp account.

55.     In total, the Adult Victim advised she believed during her time with CARTER she engaged in approximately 50 – 60 commercial sex acts under his direction. The Adult Victim stated that, during her time with CARTER, she was afraid of him. For example, she recalled getting out of the shower and seeing CARTER standing at the sink cleaning his gun, which looked like it had recently been used because smoke was coming out of it. She believed CARTER did this to "put some fear in her." Additionally, CARTER would tell the Adult Victim to keep her head down and to only speak when spoken too. She recalled that if she asked questions, CARTER would tell her to "shut the fuck up" and "stay in your place."

56.     The Adult Victim further advised that, in Atlanta and Miami, all of the money she made engaging in commercial sex acts went to CARTER.  She explained that she did not have the

choice to not give the money to him because CARTER told her if she did not give him all of the money she made that she would get punished. The Adult Victim further advised that CARTER was also making her have sex with him "raw" so much that her vaginal area was hurting.

## CONCLUSION

57.     Based on the evidence as stated above, I respectfully submit that there is probable cause to support a criminal complaint charging CARTER with one count of sex trafficking by force and coercion, in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1); one count of transporting an individual to engage in prostitution, in violation of Title 18, United States Code, Section 2421(a); one count of sex trafficking of a minor, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(2), and (c); and one count of transporting a minor to engage in sexual activity, in violation of Title 18, United States Code, Section 2423(a).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

_____
Alex Loff, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by _Telephone_ , this _7_ day of January, 2021,
in Miami, Florida.

_____
HONORABLE JACQUELINE BECERRA
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 1:21-mj-02017-Becerra

### BOND RECOMMENDATION

DEFENDANT: **ANTHONY BERNARD CARTER**

**Pretrial Detention**

(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____

AUSA:   Alejandra L. Lopez

Last Known Address: **13850 NW 41st Street**

**Miami, Florida 33178**

What Facility:   **Metro West Detention Center**

Agent(s):   **SA Alex G. Loff (FBI)**

(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)